1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| MICHAEL J. KURGAN, | CASE NO. 14-CV-1190-LAB-JMA |
| Plaintiff, | **ORDER DISMISSING CASE FOR LACK OF JURISDICTION** |
| vs. | |
| LANCE NEIBAUER, an individual; LINDA NEIBAUER, an individual; THE LANCE AND LINDA NEIBAUER JOINT TRUST; and DOES 1–50 inclusive, | |
| Defendant. | |

18    This case arises out of an airplane lease between Kurgan, the lessee, and the

19  Neibauers, the lessors[1].  Kurgan alleges that he leased the airplane expecting he'd have the

20  option to buy it when the lease ended.  Instead, when that time came, the Neibauers were

21  in negotiations to sell it to someone else.  Kurgan asserts claims for breach of contract,

22  tortious interference with business advantage, and fraud.

23    Now before the Court are the Neibauers' several motions: (1) a motion to dismiss for

24  lack of personal jurisdiction;  (2) a motion to stay under the *Colorado River* doctrine;  (3) a

25  / /

26

27    [1] The Court understands that it was really the Defendant *trust* that leased the plane,

28  and that the Neibauers argue they're not even proper defendants in this case.  Be that as it may, the Court will refer to the Neibauers simply because it would be jarring to read an Order that attributes actions and arguments to a trust rather than real people.

1   motion to dismiss for failure to state a claim; and (4) a motion for summary judgment.  The
2   Court will **GRANT** the motion to dismiss for lack of jurisdiction and not reach the others.

3   **I.      Factual Background**

4           The Neibauers' trust owns a Piper Meridian airplane.   In August 2013 Lance
5   Neibauer, on the trust's behalf, leased it to Kurgan.  The lease entitled Kurgan to exclusive
6   use of the plane for a six-month period, from September 20, 2013 to March 20, 2014.[2]  It
7   also gave Kurgan the right to buy the plane "[a]t any time during the Lease Term."  (Lease
8   ¶ 6.)  If Kurgan intended to buy it, the lease required him to notify the Neibauers of that
9   intention more than 30 days before the lease ended.  (Lease ¶ 8.)  In other words, if Kurgan
10  hadn't decided to buy the plane with 30 days remaining on the lease, he had to decide *then*
11  whether to buy or return the plane when the lease expired.

12          The lease was brokered by a man named Tim Brennan, based in South Carolina,
13  whom Lance Neibauer hired in 2013 to sell the plane. (Neibauer Decl. ¶¶ 20, 23.)  Brennan
14  listed the plane on a website called www.controller.com, which is where it came to Kurgan's
15  attention.  (Kurgan Decl. ¶¶ 8–10.)

16          The plane was located at Keystone Aviation in Aurora, Oregon when the lease was
17  executed, and that's also where Kurgan saw the plane before deciding to lease it.  (Neibauer
18  Decl. ¶¶ 2, 22; Kurgan Decl. ¶ 14.)  Lance Neibauer signed the lease at home in Bend,
19  Oregon, and the Neibauers' address in Bend is on the lease.  (Neibauer Decl. ¶ 23.)  It's not
20  clear where Kurgan actually signed the lease, but his given address on the lease is in Miami
21  Beach, Florida.  Kurgan claims he is (and was) an executive based in San Diego and spends
22  the bulk of his time here.  (Kurgan Decl. ¶ 13.)  That's plausible, because the lease required
23  the plane "to be kept in a Hangar at a home field, which at this time is Gillespie," an airport
24  in San Diego County.  (Lease ¶ 5.)  Also, Kurgan moved the plane to another San Diego
25  County airport after he took delivery of it.  (Kurgan Decl. ¶ 20.)

26  / /

27  _____

28          [2] The lease didn't actually set those dates.  It just specified that the "Lease calendar
    shall begin when the Lessee takes delivery of the plane . . . ."  (Lease ¶ 1.)  Nonetheless,
    there doesn't seem to be any disagreement between the parties over the lease period.

In December 2013, the Neibauers and Kurgan signed an addendum to the lease, extending the term for an additional year—through March 20, 2015.  The addendum would only take effect, however, if certain conditions were met by March 20, 2014, the end date of the original lease.  And that's really where the parties' dispute begins.  The conditions weren't met—there's no dispute about that, although there's a dispute about who's responsible—and as a result the addendum became null and void *and* the original end date of the lease became the effective end date.  (*See* Compl. ¶ 25.)  That posed a problem for Kurgan, because the original lease required him to exercise his right to buy the plane at least within 30 days of the lease ending.  He hadn't done that, presumably on the assumption that the addendum's conditions would be met and the lease would be extended.  The parties' language on this point is telling.  According to Kurgan, when the addendum fell through the original end date of the lease was "reinstated," the implication being that the lease actually was extended and the addendum was in effect for some brief amount of time,  and he was therefore justified in not heeding the end date of the original lease.[3]  (Compl. ¶ 25.) According to the Neibauers, on the other hand, the end date of the lease remained March 20, 2014 all along, the implication being that the addendum never took effect and it's Kurgan's own fault he failed to exercise his right to buy the plane under the original lease. (Mot. at 2:4.)  As they put it, "Kurgan's right to purchase the Aircraft expired when he failed to inform the Trust of his intent to purchase the Aircraft more than 30 days prior to the end of the lease term.  At the very latest, Kurgan's option expired at the end of the Lease term, on March 20, 2014."  (Mot. at 2:7–9.)

There appear to be at least two conditions in the lease addendum that turned out to be problematic.  First, Kurgan had to pay the Neibauers $96,000 by March 20, 2014, the end

---

[3] As Kurgan's lawyer would later put the point in a letter to Neibauer: "Nonetheless, at the time when my client would ordinarily (pursuant to the original lease) have been required to exercise his option to purchase the aircraft, by notifying you no less than thirty days prior to the termination of the original lease, both you and my client were still operating under the Addendum, which extended the original lease term by a full year.  For that reason, my client would, as of February 20, 2014 (i.e., thirty days prior to the termination of the original lease term), not have foreseen the need to exercise his option to purchase the aircraft, pursuant to ¶¶ 6 & 7 of the original lease."  (Opp'n Br., Exh. 4.)

date of the original lease.  He didn't do that.  Second, Kurgan "[had] to have installed, at his expense, the upgraded S-Tek 1500 Autopilot in 461BB aircraft.  And also have installed, the Rosen sun visor system in 461BB." (Addendum ¶ 4.)  He didn't do that either, although he blames the Neibauers because, he claims, those installations couldn't be performed until "a preliminary technical requirement was also satisfied" that was their responsibility.  (Compl. ¶ 25.)  Kurgan doesn't say, as far as the Court can tell, what this technical requirement was, which is a curious omission.

On the assumption that the addendum was in effect or would take effect, Kurgan never exercised his right to buy the plane before the original, operative lease expired. Instead, on April 3, 2014, he sent Lance Neibauer and Brennan an email that opened with an apology for "flaking out" and proposed he either return the plane to Oregon or keep it in California and rent it by the hour.  (Neibauer Decl., Exh. 3.)  Neibauer asked him to return the plane, which he did on April 5.  (Neibauer Decl. ¶¶ 7–8.)  He canceled the insurance just two days later, on April 7.  (Neibauer Decl., Exh. 4.)

Under the lease, Kurgan was obligated to pay for an annual inspection of the plane whether he bought it or not.  (Lease ¶¶ 6(a), 7(b).)  If he didn't buy it, the inspection was to be done at Keystone Aviation, where Kurgan picked up and returned the plane.  (Lease ¶ 7(b).)  The lease provided that "All Airworthiness squawks found during this inspection shall be the responsibility of the Lessee." (Lease ¶ 7(b).)  Keystone started inspecting the plane around April 14, 2014, and finished its report one week later, on April 21.  (Kurgan Decl. ¶¶ 3–4; Neibauer Decl., Exh. 5.)  After Neibauer received the report from Keystone that day, he forwarded it to Kurgan.  He said, "Attached is the punch list from Keystone.  It's actually not too bad.  The airworthy items come to $9,612.28.  So please forward to me plus the final $4K lease payment, for a total of $13,612.28 and we'll be even." (Neibauer Decl., Exh. 5.)  Kurgan wrote back on April 23 and, for the first time, invoked his right to buy the plane. (Neibauer Decl., Exh. 5.)  Kurgan takes the position now that the inspection had to be performed, anyway, before he could know for certain whether he wanted to buy the plane. (Opp'n Br. at 3:8–10.)

1    In any event, the Neibauers refused to sell the plane to Kurgan on the basis that he
2  was simply too late.  The lease required Kurgan to notify them of his intentions more than
3  30 days prior to the lease ending, and Kurgan didn't do that.  The lease ended on March 20,
4  2014, and Kurgan's email attempting to exercise his right to buy the plane didn't come until
5  April 23, 2014—*after* that 30-days-prior point, *after* the lease ended, and *even after* he
6  returned the plane.  In fact, on April 22, 2014, the day before Kurgan invoked his right to buy
7  the plane, the Neibauers signed a purchase agreement with another buyer.  (Neibauer Decl.
8  ¶ 10.)  Kurgan alleges that these negotiations began during the time he was leasing the
9  plane. (Kurgan Decl. ¶ 7.)  If that's true, it may well have been a violation of the lease, which
10 stipulated that during the entire six-month term "the Owner shall not engage any third party
11 to Purchase the Aircraft."  (Lease ¶ 5.[4])

12   In response to the Neibauers' refusal to sell, Kurgan took the position that his right
13 to buy the plane survived, and indeed was distinct from, the lease itself.  If Kurgan is right
14 on this point, then his decision to return the plane and cancel his insurance on it has little
15 significance.   Under the lease, Kurgan had paid for something called a "hot section"
16 inspection at the outset, and he maintained in an April 25 email to Neibauer—on which the
17 Neibauers' broker Tim Brennan was CC'd, which the Neibauers' argue was an intentional
18 disruption of their sale to a different buyer—that this was "additional consideration to the
19 lease price for the right to purchase."  (Neibauer Decl., Exh. 6.)  Four days later, on April 29,
20 Kurgan's lawyer sent Neibauer a letter offering to settle the dispute if the Neibauers
21 reimbursed him for the cost of the hot section, which was approximately $25,000.  In the
22 alternative, Kurgan threatened litigation.  (Opp'n Br., Exh. 4.)  The Neibauers, through
23 counsel, refused that settlement offer on May 2, and allegedly refused to consider a
24 settlement at all.  (Cosgrove Decl. ¶ 8.)

25   At this point, the parties began jockeying for a litigating position.  After Kurgan
26 threatened a lawsuit in his lawyer's April 29 letter to Neibauer, his lawyer emailed a draft

27

28     [4] The lease has two paragraphs numbered "5".  This requirement appears in the
second one.

1   complaint to the Neibauers' lawyer on May 9 and indicated an intent to file it on May 12.

2   (Opp'n Br., Exh. 5.)  Even before that, on May 1, the Neibauers' lawyer advised Kurgan's

3   lawyer by letter that they intended to sue him for intentional interference with economic

4   relations if he pursued his claims. (Opp'n Br., Exh. 3.)  That letter said "Mr. Kurgan's

5   inappropriate attempts to cloud title to the airplane by claiming a purchase option after that

6   option expired, your threat to sue based on an expired lease, and your extortionate demand

7   for money, each constitute improper means in an attempt to interfere with the contract for

8   sale of the airplane." (Opp'n Br., Exh. 3.) On May 12, the Neibauers' lawyer acknowledged

9   receipt of Kurgan's draft complaint *and* filed a lawsuit against Kurgan in Deschutes County

10  Circuit Court in Oregon.  (Kaner Decl., Exh. 1.)  On that same day Kurgan sued the

11  Neibauers here.

12         For the purposes of the pending motions, each side wants to claim that it hit the

13  courthouse tape first, but that's a picky dispute the Court isn't inclined to resolve.  The

14  bottom line is that the parties sued each other on the same day, in the court where they want

15  to be.  The Neibauers' suit against Kurgan in Oregon asserts claims for tortious interference

16  with contract and breach of contract, and it also seeks a declaratory judgment that Kurgan

17  has no right or option to buy the plane. (Neibauer Decl., Exh. 7.) Kurgan, on the other hand,

18  asserts claims for breach of contract, tortious interference with business advantage, and

19  fraud.

20  **II.     Personal Jurisdiction**

21         The first question for the Court is whether it can exercise personal jurisdiction over

22  the Neibauers.  The Neibauers argue that it can't because they live in Oregon, where Kurgan

23  picked up and returned the airplane, and because Kurgan lives in Florida and the lease was

24  brokered by Brennan in South Carolina.  Kurgan, on the other hand, argues that the Court

25  can exercise personal jurisdiction because the plane was advertised online and because the

26  lease required that the plane be kept in a hangar in southern California.

27  / /

28  / /

### 1.    Legal Standard

There's no real dispute between the parties, nor could there be, about the legal standards pertaining to personal jurisdiction.  Their disagreement is in the application of those standards to the facts of this case.

First, the burden of establishing the Court's personal jurisdiction over the Neibauers falls on Kurgan.  *Mavrix Photo, Inc. v. Branch Techs. Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011); *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  The Court isn't limited to the four corners of Kurgan's complaint in determining whether he has met this burden.   Rather, it "may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  The Court must accept Kurgan's allegations as true unless they're directly contravened, and it must resolve all disputes over the facts in his favor.  *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements LTD*, 328 F.3d 1129 (9th Cir. 2003).

Second, personal jurisdiction in this case may be general and all-purpose, or it may be specific and case-linked.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011).  General jurisdiction arises where a defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)).  "This is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).  Specific jurisdiction, by contrast, "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation. *Goodyear Tires*, 131 S.Ct. at 2851 (internal quotations and citation omitted).  In other words, "[a] court may exercise specific jurisdiction over a foreign defendant if his or her less substantial contacts with the forum give rise to the cause of action before the court." *Unocal Corp.*, 248 F.3d at 923.  The

1   Court won't even consider the general jurisdiction question.  The Neibauers devote a little

2   bit of argument to it, and Kurgan devotes only a footnote at the end of a lengthy argument

3   about specific jurisdiction.  (Opp'n Br. at 12–13.)  The only offered basis for general

4   jurisdiction over the Neibauers is that the trust has a partial interest in a few properties in

5   California—two residences and a ranch.  The Court finds that is not enough.  *See Bancroft*

6   *& Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).  If the Court can

7   exercise jurisdiction over the Neibauers in this case, that jurisdiction has to be specific.

8          Third, three conditions must be met for the exercise of specific jurisdiction to be

9   proper, that is, for there to be "at least 'minimum contacts' with the relevant forum such that

10  the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial

11  justice.'" *Schwarzenegger*, 374 F.3d at 801 (9th Cir. 2004) (quoting *Int'l Shoe*, 326 U.S. at

12  316)).  Those three conditions are:

13              (1) The non-resident defendant must purposefully direct his
                activities or consummate some transaction with the forum or
14              resident thereof; or perform some act by which he purposefully
                avails himself of the privilege of conducting activities in the
15              forum, thereby invoking the benefits and protections of its laws;

16              (2) the claim must be one which arises out of or relates to the
                defendant's forum-related activities; and
17
                (3) the exercise of personal jurisdiction must comport with fair
18              play and substantial justice, i.e. it must be reasonable.  *Id.* at
                802; *see also Yahoo Inc! v. La Ligue Contre Racisme Et*
19              *L'Antisemitisme*, 433 F.3d 1199, 1205–06 (9th Cir. 2006).

20  Kurgan bears the burden of establishing that the first two conditions are satisfied.  *Id.*  If he

21  succeeds, the burden shifts to the Neibauers to "present a compelling case" that the third

22  condition isn't satisfied.  "If any of the three requirements is not satisfied, jurisdiction in the

23  forum would deprive the defendant of due process of law."  *Omeluk v. Langsten Slip &*

24  *Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995).

25  / /

26  / /

27  / /

28  / /

1      **2.    Discussion**

2          The Court will discuss the conditions in sequence, beginning with purposeful direction

3  and availment.

4           **a.    Purposeful Direction and Availment**

5          Generally speaking, purposeful "direction" is a jurisdictional requirement for claims

6  that sound in tort, whereas purposeful "availment" is a requirement for claims sounding in

7  contract. *Schwarzenegger*, 374 F.3d at 802.  Because Kurgan's complaint contains both tort

8  and contract claims, the Court will consider both.

9          Purposeful direction consists of "actions outside the forum state that are directed at

10  the forum, such as the distribution in the forum state of goods originating elsewhere." *Id.* at

11  803.  The action must be intentional, expressly aimed at the forum state, and it must cause

12  harm the defendant knows is likely to be suffered in the forum state.  *Id.* (quoting *Dole Food*

13  *Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).  Kurgan's only argument that the

14  Neibauers purposefully directed their activities at California is this: They hired Brennan to sell

15  the plane, and he advertised it on a website, www.controller.com, that residents of California

16  could view.  But more importantly, Kurgan alleges that the website was interactive; it allowed

17  for "a viewer of the website [to] interact with a broker for a particular aircraft through the use

18  of an email exchange feature which is built into the website."  (Opp'n Br. at 9.)  The alleged

19  interactivity of www.controller.com is important, because typically "[a] *passive* Web site that

20  does little more than make information available to those who are interested in it is not

21  grounds for the exercise of personal jurisdiction." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952

22  F.Supp. 1119, 1124 (W.D. Pa. 1997) (emphasis added).  On the other hand, a highly

23  interactive website might be adequate grounds.  *See Rhapsody Int'l Inc. v. Lester*, 2014 WL

24  709899 at *5 (N.D. Cal. Feb. 24, 2014).  And if a website "falls somewhere in between

25  passive and interactive, 'the likelihood that personal jurisdiction can be constitutionally

26  exercised is directly proportionate to the nature and quality of commercial activity that an

27  entity conducts over the internet.'" *Id.* (quoting *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d

28  414, 418 (9th Cir. 1997)).

In the final analysis, the Court doesn't believe that the advertisement on www.controller.com constitutes purposeful direction towards California such that the Court has personal jurisdiction over the Neibauers. First, Kurgan alleges interactivity in a rather conclusory and plain way—the website basically allows for the buyer to email a seller—that's really no different from the website just passively providing a seller's contact information. (Kurgan Decl. ¶ 10.) Even if a website's interactivity can subject its owner—and obviously www.controller.com isn't owned by the Neibauers', or even their broker—to personal jurisdiction in a foreign forum, the interactivity must still enable or encompass an intentional act that's expressly aimed at the forum state. *See Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1129 (9th Cir. 2010) ("Thus, regardless whether a case involves the internet, the question remains whether the defendant's conduct was expressly aimed at the forum."). But Kurgan's argument runs almost in the other direction. He claims that the Neibauers advertised "on a national scale," "reached out to all states equally," and only "*effectively* reached out to the State of California." (Opp'n Br. at 8.) It's very hard to see how that is consistent with the "express aiming" requirement of the purposeful direction test.

Second, even the particular case that Kurgan cites for an "interactive website" giving rise to personal jurisdiction works against him. *See Blumenthal v. Drudge*, 992 F.Supp.44 (D.D.C. 1998). In *Drudge*—which, incidentally, interpreted a District of Columbia long-arm statute that obviously isn't implicated in this case—the question was whether the blogger/gossip columnist Matt Drudge could be sued in Washington D.C. by a political figure based there for an internet post written and published out of Los Angeles, where Drudge lived. The court held that he could. Citing *Cybersell*, it noted that "many courts have focused on the level of interactivity of a web site in determining whether there was personal jurisdiction," and it found that The Drudge Report was sufficiently interactive because browsers could directly email Drudge as well as subscribe to digital editions of The Drudge Report. *Id.* at 56. That lends some support to Kurgan's position here.

However, the Court in *Drudge* also said that "there must be also be some other non-Internet related contacts between the defendant and the forum state in order for the court

to exercise personal jurisdiction." *Id.*  Drudge had those contacts: (1) the subject matter of The Drudge Report concerned political gossip and rumor in Washington, D.C. and targeted a D.C. audience; (2) Drudge was interviewed by C-Span in Washington, D.C. and had visited D.C. on other occasions; and (3) Drudge contacted D.C. residents over the phone and through the mail to gather material for The Drudge Report.  *Id.* at 57.  This allowed the conclusion that "[t]hese non-Internet related contacts with the District of Columbia, coupled with the interactive nature of Drudge's web site, which particularly focuses on Washington gossip, are contacts that together are sufficient to establish the defendant Drudge engaged in a persistent course of conduct in the District of Columbia." *Id.* at 57.  The Court cannot reach that same conclusion with respect to the Neibauers.  To the contrary, it finds that "the ability of California residents to access the relevant website twenty-four hours a day, and to respond to solicitations for the availability of particular aircraft directly," as Kurgan describes it, does not reach the level of interactivity required for the exercise of personal jurisdiction. (Opp'n Br. at 9.)  This is especially so when that minimal interactivity isn't supplemented by additional contacts with California.

Third, and building on the previous two points that the Neibauers didn't expressly aim at California and don't have other contacts here, Kurgan doesn't actually allege that he saw the plane on www.controller.com while living in California, or that California was his home base while he negotiated the lease.  And even if that's truly the case, Kurgan doesn't allege that the Neibauers knew this.  *See Bancroft & Masters*, 223 F.3d at 1087 ("From the available cases, we deduce that the requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.").  He just argues, generally speaking, that the advertisement targeted California residents (and residents of the other 49 states).  His complaint starts with the signing of the lease, but is silent on where he was when he saw the plane's advertisement on www.controller.com and reached out to Brennan. (Compl. ¶¶ 10–11, 19.) Likewise, the declaration he submitted along with his opposition brief is silent on these facts. He claims to spend the majority of his time in San Diego, but he doesn't claim that he was

1  in San Diego when he saw the advertisement and reached out to Brennan.  (Kurgan Decl.

2  ¶¶ 8–13.)  In fact, that's counter-indicated.  Though Kurgan has an obvious interest now in

3  elevating his connection to California, his complaint *begins* "At all times mentioned herein,

4  PLAINTIFF, MR. MICHAEL KURGAN, is and was a resident of Miami-Dade County, Florida

5  . . . ."  (Compl. ¶ 1.)  In his jurisdictional statement, again, Kurgan claims to be "a citizen of

6  Florida."  (Compl. ¶ 6.)  And the lease, as the Court has already said, lists Kurgan's address

7  in Miami Beach.  On the Neibauers' end, Mr. Neibauer never met with Kurgan in California,

8  nor did Brennan, and no part of the lease or the addendum to the lease was negotiated or

9  executed there.   (Neibauer Decl. ¶¶ 22–23.)   This cuts strongly against a finding of

10  purposeful direction at California in this case.

11        That turns the analysis to the purposeful availment question.  Whereas the purposeful

12  direction analysis considers actions outside the forum directed at the forum, the availment

13  analysis considers "action taking place in the forum that invoked the benefits and protections

14  of the laws in the forum." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006).

15  That action might be, for example, executing or performing a contract in the forum.

16  *Schwarzenegger*, 374 F.3d at 802–03.   Of course, the mere fact that the Neibauers

17  contracted with a California individual in Kurgan (even assuming that characterization of

18  Kurgan is correct) doesn't establish minimum contacts in California; rather, what matters is

19  where the negotiations took place and where the consequences of the contract played out,

20  "along with the terms of the contract and the parties' actual course of dealing." *Burger King*

21  *Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985).  This ensures that a defendant won't be

22  "haled into a jurisdiction through 'random,' 'fortuitous,' or 'attenuated' contacts." *Terracom*

23  *v. Valley Nat'l Bank*, 49 F.3d 555, 560 (9th Cir. 1995) (quoting *Burger King Corp. v.*

24  *Rudzewicz*, 471 U.S. 462, 475 (1985)).

25        Just as Kurgan tries to hang purposeful direction on the online advertisement of the

26  plane, he tries to hang purposeful availment on the singular fact that, in his words,

27  "Defendants drafted a contract which expressly calls for a material term of that contract to

28  be performed within the State of California, within San Diego County." (Opp'n Br. at 6:1–2.)

This is a point Kurgan makes over and over again.  (Opp'n Br. at 6:27–28; 7:5–6; 7:15–17; 10:8–10.)  It is not exactly right.  The lease says the plane is "to be kept in a Hangar at a home field, which at this time is Gillespie.  When traveling, as available, Aircraft will also be kept in a hangar." (Lease ¶ 5.)  There is a difference, obviously, between requiring that the plane be hangared *in California* and requiring that it be hangared *wherever it is* or *wherever Kurgan lives*, which is what the Court presumes "a home field" means.  Kurgan may scoff at this distinction, but the Court doesn't.  Kurgan could presumably have picked the plane up in Oregon, flown it straight to Anchorage, Alaska, and stayed there for 6 months.  He could have flown straight to Florida, where he's a resident, and kept the plane in a hangar near his home.  It's simply inaccurate to say, as Kurgan does, that the lease required the contract to be performed in California.  It did not.  At best, it acknowledged that it might be performed in California.  That is what the language "which *at this time* is Gillespie" suggests.  But it also, by those words, acknowledged that it could be performed anywhere else in the country.

The Neibauers are right to argue that "[t]he only performance requirements of the Lease that have definitive, mandatory locations attached to them all point to Oregon." (Reply Br. at 2.)  Kurgan had to take possession of the plane in Oregon.  (Lease ¶ 1.)  Before taking possession, he had to engage Keystone Aviation in Aurora, Oregon to perform a hot section inspection.  (Lease ¶ 2.)  If Kurgan didn't buy the plane, he had to return it to Keystone Aviation when the lease was up, and he had to have it inspected there.  (Lease ¶ 7.)  Kurgan concedes that he visited Oregon three times in connection with this case: "once to view the subject aircraft, once to pick up the subject aircraft at the beginning of the lease term, and once to return the subject aircraft, at the end of the lease term." (Kurgan Decl. ¶ 14.)  That's the State where the Neibauers have purposefully availed themselves.

In an attempt to argue that the mere mention of California in the lease constitutes purposeful availment, Kurgan cites *McGlinchy v. Shell Chemical Co.*, which held that there was *not* purposeful availment where the contract at issue did *not* make any reference to California.  845 F.2d 802, 816 (9th Cir. 1988).  Fair enough.  But the court in *McGlinchy* gave

1  three other reasons for the absence of purposeful availment that can also be given here.

2  First, the contract was negotiated abroad and merely signed in California. *Id.* In this case,

3  the lease was neither negotiated *nor* signed in California. Second and third (they are

4  opposite sides of the same coin), the defendant didn't perform or execute any portion of the

5  contract in California, and it was only the plaintiff's unilateral activity that established a

6  connection. *Id.* A plaintiff's performance of a contract in California can't give jurisdiction

7  over a nonresident defendant; it's the defendant's activity that has to provide the basis for

8  jurisdiction. *Id.* at 816–17 (citing *Republic Int'l Corp. v. Amco Eng'rs, Inc.*, 516 F.2d 161 (9th

9  Cir. 1975)). Kurgan's argument overlooks that. To the extent there's any California

10 connection in this case, it is that *he* happens to have hangared the airplane here as opposed

11 to anywhere else in the country that the lease would allow him to. Any California

12 performance is *his*, not the Neibauers'. Finally, as the Neibauers point out, were Kurgan to

13 try to hang purposeful availment on the www.controller.com website, the argument would fail.

14 In *Cybersell*, the court held that a website capable of "receiving the browser's name and

15 address and an indication of interest" didn't establish purposeful availment in a state where

16 it was accessed. *Cybersell*, 130 F.3d at 419. That is roughly the same level of interactivity

17 that Kurgan attributes to the website on which the plane was advertised.

18       In sum, the Court does not find, for the reasons given above, that the Neibauers have

19 purposefully availed themselves of the privilege of conducting business in California, or

20 invoked the benefits and protection of California laws.

21 **III.   Conclusion**

22       The Court has found that Kurgan can't satisfy the first condition for the Court's

23 exercise of specific personal jurisdiction over the Neibauers. This is not because his

24 arguments are feeble. It is because the caselaw and facts of this case are against him.

25 Because he can't satisfy even the first condition, personal jurisdiction isn't established in

26 California. *Schwarzenegger*, 374 F.3d at 797. His claims against the Neibauers in this Court

27 are therefore **DISMISSED WITHOUT PREJUDICE**. The Court doesn't consider the

28 Neibauers' other arguments to defeat this case, including that: (1) it ought to be stayed under

1  the *Colorado River* doctrine while the Oregon case proceeds[5]; (2) it should be dismissed for

2  failure to state a claim; (3) summary judgment is appropriate; and (4) this case is really

3  between Kurgan and the Neibauers' *trust* rather than the Neibauers *personally*.

4

5  **IT IS SO ORDERED**.

6  DATED:  August 11, 2014

7

8  **HONORABLE LARRY ALAN BURNS**
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  [5] The Court was informed by Kurgan's counsel that the Oregon case has been

27  removed to federal court and that a motion to transfer venue to this District is pending. (Counsel called simply to ask about the protocol for having this judicially noticed, which has turned out not to be important.)  It appears that on August 8 the Oregon court, pursuant to

28  a joint stipulation, stayed the case pending the Court's ruling on jurisdiction here. *See Lance and Linda Neibauer Joint Trust v. Kurgan*, 14-CV-1192, Doc. No. 9 (D. Oregon 2014).